

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | | |
|---|---|---|
| RODERICK WOULLARD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:05-CV-97 |
| | § | |
| THE STATE OF MISSISSIPPI, | § | |
| GOVERNOR RONNIE MUSGROVE, | § | |
| ERIC CLARK, AMY TUCK, TOMMY | § | |
| REYNOLDS, | § | |
| | § | |
| Defendants. | § | |

## OPINION and ORDER

This case, challenging the constitutionality of the 2002 legislative reconfiguration of Senate District 45, was tried before this three-judge court on May 1-2, 2006. The issue for decision is whether, by relocating Mr. Woullard and other African-American citizens from Former Senate District 45, to new and different districts, the defendants subordinated traditional redistricting principles to unlawful racial considerations. For the reasons that follow, we find and conclude that race was not a predominant factor in drawing the boundaries of Senate District 45, and that Mr. Woullard and other African-American citizens were not classified on the basis of race for the purpose of redrawing the district.

### Procedural History

In March 2003, Mr. Roderick Woullard and Mr. Craig Ducksworth filed a complaint for declaratory and injunctive relief, asserting a claim for racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution.[1] They alleged that Senate District 45 was drawn with the race-based goal of minimizing the number of minority voters in the district.

After the defendants moved for summary judgment, the Chief Judge of the United States Court of Appeals for the Fifth Circuit, Judge Carolyn King, constituted this three-judge court pursuant to 28 U.S.C. § 2284(a) by order entered on June 24, 2005.

In their summary judgment motion, the defendants argued, among other things, that Mr. Woullard does not have standing to pursue the racial gerrymandering claim because he does not live in the challenged district -- District 45 -- and because he cannot prove that he was moved from former District 45 to current District 41 because of his race. The defendants also argued that the plaintiffs have failed to demonstrate the existence of a genuine issue of material fact with respect to whether the defendants subordinated traditional redistricting principles to racial considerations when drawing the boundaries of current District 45. This court heard oral argument on the motion on August 18, 2005. On September 2, 2005, we denied the defendants' motion for summary judgment, except as to the issue of Mr. Woullard's standing, which issue was carried with the case.

_____

[1]The original complaint also alleged that Senate District 45 under the 2002 redistricting plan violated § 2 of the Voting Rights Act, 42 U.S.C. § 1973, et seq. On May 27, 2004, the plaintiffs amended their complaint, dismissing the § 2 claim.

On March 20, 2006, the plaintiffs moved to dismiss Mr. Ducksworth as a plaintiff, because he had <u>voluntarily</u> moved from the challenged district (District 45) to a portion of a neighboring district (District 44) that was not affected by the 2002 redistricting process (unlike Mr. Woullard, who alleges that he was involuntarily moved from District 45 to District 41 on account of his race). The plaintiffs therefore concede that Mr. Ducksworth no longer has standing to pursue his claims. We granted the plaintiffs' motion to dismiss Mr. Ducksworth from the lawsuit on March 23, 2006.

The defendants asked us to expedite our consideration of their motion for summary judgment on the question of Mr. Woullard's standing, which, as earlier noted, we had previously carried with the case. Mr. Woullard presently resides in District 41 as a result of the 2002 redistricting. He claims that current District 45 was racially gerrymandered. The Supreme Court of the United States has held that a person who does not live in the district that is the primary focus of his racial gerrymandering claim does not have standing to sue <u>unless</u> he can prove that he was personally subjected to a racial classification. <u>United States v. Hays</u>, 515 U.S. 737, 739 (1995). In other words, a person living outside the alleged racially gerrymandered district must establish that he has been personally denied equal treatment under the law because of the defendants' discriminatory conduct. <u>Id</u>. Thus, the Supreme Court

suggests that a person who does not presently live in the challenged district, but who was removed from the challenged district on account of his race, would have standing.  Id. at 747; see also Sinkfield v. Kelley, 531 U.S. 28, 30 (2000) (holding that plaintiffs lacked standing because "they have neither alleged nor produced any evidence that any of them was assigned to his or her district as a direct result of having 'personally been subjected to a racial classification'" (quoting Hays, 515 U.S. at 745)).

The mere fact, then, that Mr. Woullard no longer resides in the challenged district does not, standing alone, preclude his standing to assert the claim.  In this case, Mr. Woullard alleged that he personally, along with other African-American citizens, was removed from former District 45 and placed in current District 41, because of his race. On March 30, 2006, we denied the defendants' motion for summary judgment, because we concluded that the question of Mr. Woullard's standing is intertwined with the merits of this case:  that is, the injury that Mr. Woullard must demonstrate for purposes of standing -- that the defendants discriminated against him on the basis of his race  -- is the same injury that he must prove to prevail on the merits of his racial gerrymandering claim.[2]

_____

[2]See Barrett Computer Services, Inc. v. PDA, Inc., 884 F.2d 214, 219 (5th Cir. 1989) ("[I]n cases in which the merits of the claims asserted are intertwined with the jurisdictional issue of standing, challenges to standing are frequently resolved in summary judgment proceedings ... or at a trial on the merits.  In such cases, to compel a preliminary factual inquiry into the plaintiff's standing would force the party bringing the suit to prove merit

4

At the summary judgment stage, Mr. Woullard presented evidence sufficient to establish the existence of a genuine issue of material fact as to whether, by removing him and other African-American citizens from Former Senate District 45, the defendants subordinated traditional redistricting principles to elevated racial considerations when they redrew the boundaries of current District 45 during the 2002 redistricting process.  Therefore, Mr. Woullard was not required to prove the merits of his claim in order to have standing to invoke the jurisdiction of this court.[3]

<u>Discussion of the Evidence Presented at Trial</u>

A.

The plaintiffs relied in large part on maps and statistical data to support their claim that African-American citizens were removed from District 45 on account of their race.  Those maps and

---

issues in order to establish jurisdiction.").

[3]See <u>United States v. SCRAP</u>, 412 U.S. 669 (1973) (holding that district court correctly denied motion to dismiss complaint for lack of standing where plaintiffs' allegations, if proved, would place them among those persons injured in fact by the agency's challenged action and observing that if the defendants believed that the allegations of standing were untrue, they should have moved for summary judgment on the issue and demonstrated that the allegations were sham and raised no genuine issue of fact); <u>Gwaltney of Smithfield v. Chesapeake Bay Foundation</u>, 484 U.S. 49 (1987) (citing <u>SCRAP</u>, and observing:  "If the defendant fails to make [a showing that the plaintiff's allegations of standing were sham and raised no genuine issue of fact] after the plaintiff offers evidence to support the allegation, the case proceeds to trial on the merits, where the plaintiff must prove the allegations in order to prevail.  But the Constitution does not require that the plaintiff offer this proof as a threshold matter in order to invoke the District Court's jurisdiction.").

the statistical evidence present a <u>prima</u> <u>facie</u> case for the plaintiffs.  They reflect that, before the 2002 redistricting, Senate District 45 encompassed all of Forrest County below the northern limits of the City of Hattiesburg, and included a sliver of land along the northeastern edge of Lamar County within the Hattiesburg city limits.  Former District 45 included all of the City of Hattiesburg located within Forrest County except for a narrow corridor around U.S. Highway 49 northwest of Interstate 59. It contained no split precincts and crossed only one county line. According to the 2000 census data, 98% of Former District 45's 50,531 residents lived in Forrest County, 21,760 (43%) of whom being African-Americans.  Former District 45 also had a deficit of 4,174 persons in relation to the ideal district size for the 2002 redistricting plan.

As a result of the 2002 redistricting, current District 45 contains portions of five counties.  It contains nine split precincts and crosses five county lines.  The City of Hattiesburg is divided among three districts.  The eastern portion of Hattiesburg, where most of its African-American citizens reside, was removed from Former District 45 and split between two adjoining districts.  Of current District 45's 54,213 residents, 60% reside in Forrest County, but only 11,068 (20%) are African-Americans.  As a result of the 2002 redistricting process, 17,516 Forrest County residents, 13,516 (77%) of whom are African-Americans, were moved

6

from District 45 into surrounding districts.   The defendant's expert, Dr. Ronald Weber, who testified at trial for both the plaintiff and the defendants, acknowledged that Forrest County is split between District 45 and another district along racial lines. It is thus clear that when District 45 was redrawn, its black population was dispersed among the redrawn districts. Nevertheless, the African-American population of adjoining District 41, into which Mr. Woullard was moved, is 41.89%, which is a greater percentage than that in Former District 45 (38.15%) from which he was removed.

Prior to the 2002 redistricting, Former District 45 included 30 precincts in Forrest County, 11 of which were majority-minority precincts.   All nine of the precincts removed in their entirety from Former District 45 during the 2002 redistricting were majority-minority precincts.   Those nine precincts included 15,977 persons, 12,846 (80%) of whom were African-Americans.   Of the eighteen precincts retained in their entirety in the redrawn District 45, only 6,402 (23%) are African-Americans.

Mr. Craig Ducksworth, one of the original plaintiffs in this case, testified that, after the 2002 Plan was adopted by the Senate, he called and spoke to Mr. Corey Proctor, who was employed at that time as the Cartographer for the Mississippi Standing Joint Legislative Committee on Reapportionment ("Joint Committee").   Mr. Ducksworth contacted Mr. Proctor to get some maps of the redrawn

District 45 and some precinct information, because he wanted to run for the Senate in that district. During that conversation, their discussion turned to the subject of the changes in the redrawn district, and Mr. Ducksworth asked Mr. Proctor why those changes had been made. According to Mr. Ducksworth, Mr. Proctor told him that Senator Tom King, the incumbent Senator for District 44, and Senator Ron Farris, the incumbent Senator for District 45, did not want "those people" in their districts. Mr. Ducksworth interpreted "those people" as a reference to African-American voters who were drawn out of District 45 during the 2002 redistricting.

As we have mentioned earlier, Mr. Woullard lived in Former District 45 under the 1992 Plan but, as a result of the 2002 redistricting, he now lives in Senate District 41. Mr. Woullard is an African-American and a Democrat. He currently serves on the Board of Supervisors in Forrest County, Mississippi. Mr. Woullard impressed the court as a public-spirited citizen who has the best interests of his community at heart and apparently represents them well on the Board of Supervisors. We found him to be a straightforward and credible witness.

Mr. Woullard testified at trial that he filed this lawsuit because he felt that the 2002 redistricting plan, particularly with respect to District 45, did not put people with the same interests in the same district. He mentioned the City of Hattiesburg had elected a minority mayor, and testified that he felt that the City

8

was split up in the redistricting process so as to reduce the possibility for minority influence in District 45.  When asked by his counsel on direct examination if he believed that the splitting of minority precincts among two or three districts had been done on account of the race of the individuals living in those precincts, he stated:  "I think that was partly the reason."

On cross-examination, Mr. Woullard acknowledged that his alleged injury was not unique, but was shared with all other African-Americans who resided in Former District 45 under the 1992 Plan, but who were moved to District 41 or another district under the 2002 Plan.  He also acknowledged that an African-American has a better opportunity to be elected in current Senate District 41 than in Former District 45, because the black voting age population ("BVAP") in current District 41 is greater than the BVAP in Former District 45.  He further acknowledged that he could run for the Senate in District 41, which was an open seat due to the death of the incumbent, Senator Harvey.

On redirect examination, Mr. Woullard testified that, because some of the precincts in current District 45 were also part of his county supervisor's district, he still had the ability to exercise some influence in the election of a Senator for District 45, even though he no longer resides in that district.

Mr. Woullard's repeated assertion of his belief that the aim of the redistricting of District 45 was to destroy a "commonality

of interest" existing among the District's African-American population, a "commonality of interest" that previously had moved those inhabitants politically in the same direction, along with his seemingly reluctant statement that racial considerations were "partly" to blame for the redistricting of District 45, led the Court to the following questioning:

> JUDGE WINGATE:  So what you're really complaining about is not so much of a racial divide but a common interest divide.
>
> A    Common interest divide, Your Honor.
>
> JUDGE WINGATE:  So you're saying that if they had been allowed to remain together, then those common interests could have cohered.
>
> A    Yes, sir.
>
> JUDGE WINGATE:  But you're not so much complaining about the racial divide, though.
>
> A    Not at all.  In fact, I said it in my deposition that I saw this more of an interest divide than it was a racial divide, and I still hold to that.
>
> Now, do I believe that it was some racial concerns?  Based on some conversations that I have had, I do.  But my problem is ... the fact that they have killed the common interest.  That's really what was divided.
>
> JUDGE WINGATE:  All right.  Now, when you brought this lawsuit and you submitted it under the theory which you're submitting it, is it your contention that you're submitting this theory, your lawsuit, on -- this whole matter on common divide?
>
> A    Yes, sir, Your Honor.

JUDGE WINGATE:   But now are you aware that your counsel is making this into a racial case?

A     Can I say it like this, Your Honor?

JUDGE WINGATE:   Say it like it is.

A     My interest is that our interests have been fractured.   But I think the reason that --

JUDGE BRAMLETTE:   When you say "our," who do you mean?

A     "Our" meaning the precincts in that city, because they elected a minority mayor.

Now, do I think that it was racially motivated?  Yes, sir, I do.  I mean, to me you can't separate -- in some cases you can't separate the two because, I mean, why all of a sudden now did they have to take one precinct and make three districts vote out of one precinct?  That's never happened before, not in our area.

....

JUDGE WINGATE:   But your complaint is that they can't vote in the same election and pool all their votes together.

A     That's exactly right.

### B.

We now turn to the evidence offered by the defendants. Senator Hob Bryan, a Democrat who represents Senate District 7, in the northeastern part of the State, gave detailed testimony as to how the 2002 redistricting plan was drafted.  Based on 2000 Census data, the Mississippi Legislature determined that it was necessary to re-draw state Senate districts to satisfy applicable state and

11

federal laws, including the "one-man, one-vote" principle. Under the 1992 Senate Redistricting Plan in effect at the time of the 2000 Census, the ideal population for a Senate district was 49,485. Because of the growth in the State's population as reflected in the 2000 Census, the ideal population for a Senate district increased to 54,705. The population growth was not spread evenly over the State. Instead, the counties along the Mississippi Gulf Coast, some areas of central Mississippi, and the DeSoto County area in extreme northwest Mississippi, just south of Memphis, Tennessee, experienced significant population increases. By contrast, the population in the Mississippi Delta area had decreased.

On January 26, 2001, the Joint Committee convened and elected officers. Senator Bryan, who was at that time serving as the Chair of the Senate Elections Committee, was elected as Vice-Chair of the Joint Committee. The Joint Committee adopted the following principles to be implemented in preparing the redistricting plan: (1) each district's population should be less than five percent above or below the mean population of a district; (2) each district should be contiguous; and (3) the plan should comply with the Voting Rights Act and all other federal and state laws. The Joint Committee hired expert consultants to assist it.

The Joint Committee conducted public meetings throughout the State, to allow citizens an opportunity to express their views about the redistricting process. A public hearing was conducted on

May 4, 2001, on the campus of the University of Southern Mississippi in Hattiesburg.  The Plaintiff, Mr. Woullard, did not attend the hearing.  Prior to the adoption of a final plan, neither Mr. Woullard nor anyone else from the Hattiesburg area expressed any objection or concern to Senator Bryan regarding Senate District 45.

Senator Bryan testified that, in crafting the redistricting plan, he sought to maintain the existing number of majority-minority districts (twelve under the 1992 Plan) and to maintain minority voting strength in minority influence areas to ensure compliance with the Voting Rights Act.  The 2002 Plan contains the same number of majority-minority districts as the 1992 Plan.

Another of Senator Bryan's goals was to draft a plan that would be well-received by the Senate leadership and that would get enough votes to pass the Senate.  Accordingly, he sought to draw districts for key Senate leaders that would not result in their defeat in the 2003 election.  Senator Bryan then met with every incumbent member of the Senate and obtained their views as to their ideal districts.

Former Senator Ron Farris, a Republican who represented Senate District 45 under the 1992 Plan, was the only senator who brought election returns from prior elections to his meeting with Senator Bryan.  At that meeting, Senator Farris showed Senator Bryan the election data and stated that he would like to remove some of the

precincts in which he had not fared well in past elections, and that he wanted to keep precincts in which he had done well.   The election returns that Senator Farris brought to the meeting did not contain any racial data.

After meeting with all of the incumbent senators, Senator Bryan began drafting a plan.   Senator Bryan made the decisions about where the boundaries of the districts were drawn.   He received technical assistance in drawing the maps from Mr. Corey Proctor, the cartographer who was, at that time, employed by the Joint Committee.   Senator Bryan sought to accommodate the wishes of incumbent senators to the extent possible.   Of course, it was not possible for him to do that in every case.   For example, because of the significant population growth in the DeSoto County area, it was necessary for him to create a new district there and to collapse another district (Senate District 19, the seat held by former Senator Tim Johnson) in the central part of the State.   Also, because of the large population growth along the Mississippi Gulf Coast, the Senate districts in that part of the state had to be shifted southward to accommodate that population.

The Hattiesburg area had at least one minority influence district under the 1992 Plan -- District 45, which had a black voting age population of 32.5% under the 1992 Plan.   Senator Bryan believed that he needed to maintain a minority influence district in that area so as to avoid retrogression under Section 5 of the

14

Voting Rights Act.  He achieved that purpose by redrawing Senate District 41 which now, under the 2002 Plan, has a BVAP of 38.21%. As we have said before, Mr. Woullard lived in District 45 under the 1992 Plan but, as a result of the 2002 redistricting, his residence is now located in District 41.

The night before Senator Bryan was to present the draft plan to the  Senate Elections Committee, the Senate leadership directed him to draw District 44 to satisfy the incumbent, Senator Tom King. Senator King wanted to preserve his base as much as possible, and therefore did not want his district redrawn in any significant way. Specifically, Senator King wanted to keep in his district the precincts that comprised part of his base in the City of Petal area and in Lamar County.  To accommodate Senator King, Senator Bryan made last-minute changes in the boundaries of Districts 41, 44, and 45.  In order to maintain contiguity and to connect the City of Petal area with the Lamar County area of District 44, Senator Bryan had to include in District 44 a narrow strip of land running through the City of Hattiesburg, along the border of District 45. As a result of these changes to accommodate Senator King, Senator Bryan was not able to accommodate the wishes of former Senator Farris with respect to District 45, and he contacted Senator Farris to advise him of this development.

Senator Bryan presented the plan to the Senate Elections Committee the next day.  Senator Farris introduced an amendment to

15

move the Sunrise precinct from District 44 into District 45, and that amendment was approved by the Committee.   Senator Farris testified that he owned a residential lot in the Sunrise precinct and wanted that precinct in District 45 in the event that he decided to build a home on that property.

The full Senate adopted the plan, and it was approved by the State House of Representatives.   It was then submitted to the United States Department of Justice for preclearance pursuant to the requirements of the Voting Rights Act.   The Justice Department precleared the plan on June 17, 2002.   According to Senator Bryan, this occasion was the first time a Senate redistricting plan had been precleared by the Department of Justice, without objection, since he has served in the Senate.   We do note that neither Mr. Woullard, Mr. Ducksworth, nor any other previous resident of District 45, objected to the 2002 Plan for District 45.

Senator Bryan testified that he did not hear either former Senator Farris or Senator King state that they did not want "those kinds of voters" -- referring to African-Americans -- in their districts.   He further testified that race was not the predominant factor in drawing Senate District 45.

Senator Tom King and former Senator Ron Farris also testified for the defendants.   Both of them denied that they had made any statements to Mr. Proctor or Senator Bryan to the effect that they did not want African-American voters in their districts.

Mr. Proctor also testified for the defendants.  At the time the 2002 redistricting plan was drawn, Mr. Proctor was employed as the cartographer for the Joint Committee.  At the time of trial, he was employed by the Forrest County Board of Supervisors in the Forrest County Planning Department.  As we earlier noted, Mr. Woullard is a member of the Forrest County Board of Supervisors and thus is one of Mr. Proctor's current employers.  In his duties as cartographer during the redistricting, Mr. Proctor drew maps on the computer, but Senator Bryan instructed him on how the boundaries of the districts were to be drawn.  Mr. Proctor testified that he was present when Senator Bryan met with Senator King and former Senator Farris.  He testified that he did not tell Mr. Ducksworth anything to the effect that Senator King or former Senator Farris had stated that they did not want black voters in their districts.

The defendants also presented the testimony of two expert witnesses.  Dr. Gerald Webster, an expert in political geography, conducted an examination of the primary redistricting criteria -- equal population, racial equity, contiguity, and compactness. Based on his analysis, Dr. Webster concluded that these traditional redistricting criteria were not subordinated to racial considerations in the redrawing of Senate District 45.

Dr. Ronald Weber, an expert in political redistricting, conducted a boundary segment analysis of District 45 under the 2002 Plan.  Although he determined that Forrest County is divided along

17

racial lines, none of the other four counties which comprise District 45 was so divided. Based on his analysis, Dr. Weber concluded that the instances of county splits and voting precinct boundaries in the creation of District 45 under the 2002 Plan established that race was not the predominant factor in redrawing District 45. He also examined election results from prior state senate and gubernatorial elections and concluded that those results indicated that partisan politics was an important factor in redrawing Senate District 45.

### Decision of the Court

We begin with the governing law. In order to prevail on his racial gerrymandering claim, the plaintiff was required to prove that, during the 2002 redistricting process, the defendants subordinated traditional redistricting principles to elevated racial considerations, by removing him, along with other African-American citizens, from Former District 45 because of their race. Shaw v. Reno, 509 U.S. 630 (1993).

At the summary judgment stage, the plaintiffs presented compelling documentary evidence. African-Americans comprised 38.15% of the population in Former District 45 under the 1992 plan, but only 20.42% of the total population in District 45 under the 2002 Plan. Based on 2000 Census data, Former District 45 needed 4,174 more persons in order to reach the ideal population for a Senate district. Yet, during the 2002 redistricting process,

18

17,516 persons -- 13,516 (77%) of whom were African-Americans -- were removed from Former District 45 and other persons were brought into the newly drawn District.  The defendant's expert found that Forrest County, one of the five counties that are now located, in part, in current District 45, was split along racial lines.

Further, the interpretation Mr. Ducksworth placed on his telephone conversation with Mr. Proctor strengthened his impression that District 45 was drawn with the race-based goal of minimizing the number of minority voters in the district.  In sum, the court came to the case, after reading the briefs and reviewing the summary judgment evidence, undecided but clearly impressed with the strength of the plaintiff's case.  The plaintiff's case was not frivolous.

Ultimately, however, the trial put a different face on the case.  At the trial, the strength of the plaintiff's documentary and statistical evidence was effectively rebutted by the compelling testimony of Senator Hob Bryan; that is to say, Senator Bryan's testimony convincingly demonstrated that there were explicit reasons other than race for drawing the particular boundaries of the 2002 District 45, which we have enumerated above.  At the same time, the plaintiffs' witnesses' testimony added little to the specifics that were not told by the documents and statistics.  Their testimony largely was an expression of intuitive feelings based on the statistics, and their case was weakened by concessions

in the testimony that their grievance was based on factors more predominant than mere racial classification.

Mr. Ducksworth's impression of his telephone conversation with Mr. Proctor was a central component for the claim that race was a predominant factor in redrawing District 45.   Mr. Ducksworth impressed us as an honest public-spirited citizen.   Nevertheless, with regard to the disputed issues of the telephone conversation, we credit the testimony of Mr. Proctor for several reasons.  First, he impressed us as a credible witness who testified in an objective and impartial manner.   Second, Mr. Proctor has no further connection with the defendants in this case.  Third, Mr. Proctor is in fact employed by the Forrest County Board of Supervisors, on which Mr. Woullard now serves.  Yet, Mr. Proctor did not waver in his testimony about his conversation with Mr. Ducksworth, despite the fact that it was against the interest of one of his current employers, Mr. Woullard.   Fourth, Mr. Proctor's testimony was supported by the testimony of Senator Bryan, Senator Tom King, and former Senator Farris, whom we also found to be credible, that they did not tell Mr. Proctor anything to the effect that they wanted persons excluded from their respective districts on account of race.  Finally, the remarks attributed to Mr. Proctor as a racial reference are inconsistent with the overwhelming weight of the testimony at trial that race was not a predominant consideration in the drafting of Districts 41, 44, and 45.  We therefore assume that

Mr. Ducksworth's testimony, to the effect that his conversation with Mr. Proctor suggested race as a reason for redrafting District 45, was simply a mistaken impression he drew from the conversation.

We also observe that Senator Bryan mentioned only one group of voters that none of the incumbent Senators wanted in their districts -- not because of their race or for any personal reasons, but because of geography and politics.  Senator Bryan explained that, because of the population growth along the Gulf Coast, the coastal Senate districts had to be redrawn to absorb the additional and now more compact population.  This consideration meant that the Senate districts to the north of the Gulf Coast had to be expanded southward to absorb the population residing on the north of the Gulf Coast districts, after population increases caused the Gulf coast districts to move south.  Almost all of those districts just to the north of the Gulf Coast, however, were represented by Senators who lived in the northern ends of their districts.  As a result, none of those incumbent Senators wanted the precincts that were located between the Gulf Coast districts and their existing districts to be put into their redrawn districts -- largely because those precincts were far away from the incumbent Senators' homes and outside their existing districts under the 1992 Plan.  These were the factors according to Senator Bryan -- population shifts and preferences of incumbents for the most comfortable and friendly

districts -- that determined the reconfiguration of the districts
now in controversy.

When the court considers Mr. Woullard's testimony as a whole,
we evaluate it to say that the injury the black voters suffered
from the break-up of the minority population of District 45 is that
for general political purposes -- more far-reaching than the senate
seat itself -- the cohesiveness of the black political community of
the City of Hattiesburg and Forrest County was weakened.  In this
sense and for other less specific reasons, he concluded that the
redrafting of Senate District 45 was motivated in part for racial
reasons.  It is not clear to the court exactly how the general
cohesiveness of the black political community has been lost given
that no other offices are affected by the redrawing of the Senate
district, that the Former District 45 was represented by a
Republican (Mr. Woullard is a Democrat), and District 41 where Mr.
Woullard currently resides has a larger BVAP than Former District
45.  We do understand, however, how it is more difficult for
someone in the Hattiesburg community (such as Mr. Woullard), who is
included in the new District 41, to get elected to the Senate when
he or she has to depend on votes from other counties and
communities with which they have no contact.  Although this is
true, and we can understand Mr. Woullard's grievance in this
respect, such a circumstance is a frequent, natural and expected
result of the one-person, one-vote requirement, to balance the

22

population evenly in each district, and applies equally to white communities that are dispersed across county lines in the same way.

Accordingly, for the reasons above and for the following reasons, we conclude that the plaintiffs have failed to show that the defendants subordinated traditional redistricting principles to race when drawing the boundaries of Senate District 45, and that the complaint must be dismissed for the following reasons:

1.  We fully credit the testimony of Senator Bryan that he personally, as the person primarily responsible for drawing the districts in question, was motivated essentially by three factors: (1) to comply with the one-person, one-vote principle; (2) to satisfy the requirements of the Voting Rights Act, including no retrogression of minority voting strength in the State as a whole; and (3) to satisfy, to the extent possible, the requests of incumbent Senators.

2.  The Senate plan clearly accomplished the legitimate goals that Senator Bryan set out to achieve. We specifically find that no evidence has been adduced that race was a predominant factor in the drafting of District 45, or any other district. We believe that this fact is demonstrated by the Department of Justice's preclearance of the plan without objection.

3.  We specifically find that no remarks were made to Mr. Ducksworth that should be construed as indicating that District 45 was drawn for racial reasons.

23

4.   Although the plaintiff's testimony reflected real and legitimate concerns about the repercussion of the redistricting of District 45 on the black political community, the court is impressed that the injury about which the plaintiff is essentially complaining -- that is, the disruption of the political community -- is often the natural result of complying with the one-person, one-vote principle.   Absent intentional racial discrimination, of which there is no evidence in this case, it is a result that affects all political communities.

5.   In sum, we find no intentional race discrimination in the drawing of District 45 and consequently conclude that the plaintiff, Mr. Woullard, suffered no personal injury as a result of racial classification.   Accordingly, the plaintiff's request for declaratory and injunctive relief is DENIED, and his claims against the defendants are DISMISSED, with prejudice.   Final judgment shall be entered accordingly.

THIS **29**ᵗʰ day of _____June_____, 2006.

_____
E. GRADY JOLLY
United States Circuit Judge


_____
HENRY T. WINGATE
Chief United States District Judge


24

DAVID BRAMLETTE
United States District Judge